UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

------------------------------------------------------------------------x
LUKASZ GOTTWALD p/k/a DR. LUKE,  :
: Case No. _____
Plaintiff,  :
:
-against-  :
:
PEBE SEBERT,  : **Jury Trial Demanded**
Defendant.  :
:
:
------------------------------------------------------------------------x

# COMPLAINT

Plaintiff Lukasz Gottwald p/k/a Dr. Luke ("Gottwald"), by and through his undersigned attorneys, as and for his Complaint against Defendant Pebe Sebert ("Defendant"), alleges, with personal knowledge of his own actions, and upon information and belief as to the actions of others, as follows:

## PRELIMINARY STATEMENT

1. Defendant is the mother of Kesha Rose Sebert ("Kesha"), a recording artist and songwriter. Gottwald is a Grammy-nominated songwriter and producer of smash hit musical recordings.

2. Kesha and her mother, unhappy with contracts Kesha entered into with Gottwald and his companies, have engaged in a highly public extortion and smear campaign designed to pressure Gottwald into acquiescing to allowing Kesha out of her contracts.

3. Notably, this is not the first time that the Sebert family has shamelessly raised disgusting, fictitious allegations with the intent of smearing Gottwald in order to get their way. In late 2005, Kesha repudiated her obligations under her recording agreement with Gottwald's

company Kasz Money, Inc. ("KMI"). Shortly thereafter, her representatives began threatening Gottwald that if he did not agree to terminate that contract, false allegations of abuse of Kesha would be held over his head and made public. Because Gottwald refused to accede to these threats, Kesha eventually acknowledged that these accusations were false, re-affirmed her obligations under her recording contract, and entered into a new publishing agreement with Gottwald's publishing company Prescription Songs, LLC ("Prescription Songs") dated November 26, 2008 that with the significant efforts of Gottwald resulted in Kesha's emergence as an international recording star.

4. Thereafter, in 2011 both Kesha and Defendant were deposed in a lawsuit commenced against Kesha in New York by one of her former representatives. When questioned about the circumstances of Kesha's prior contractual repudiation, and while represented by one of the nation's premiere law firms, both Kesha and Defendant testified unequivocally, at separate times and places and under penalty of perjury, that Gottwald had never engaged in any abuse of Kesha. Indeed, Kesha testified: "***Dr. Luke never made sexual advances at me.***"

5. For years following Kesha's reunion with Gottwald and breakout success, Kesha and Defendant expressed profound gratitude and admiration for all that Gottwald has done for their careers and their family. For example, in emails to Gottwald, Defendant stated: "***Thank you Luke[]. You have changed our lives forever. I love you !!***" and "***I know you are going to be a great dad.***" Similarly, Kesha sent Gottwald a birthday card stating: "***Thank you 4 helping me make my WILDEST dreams come true!***"

6. Nevertheless, starting in or about October 2013, Defendant began to spread false, disgusting and highly damaging statements about Gottwald, comments which constitute defamation *per se*.

7. On October 28, 2014, Gottwald and certain of his companies commenced an action in the Middle District of Tennessee (the "First Tennessee Action") for defamation and tortious interference against Defendant for those defamatory comments that Defendant was known to have published prior to the commencement of the First Tennessee Action.

8. Since that time, Defendant has continued to publicly defame Gottwald to an even greater public audience via social media posts and interviews, comments which also constitute defamation *per se*. Defendant's ongoing campaign against Gottwald has significantly tarnished his reputation, and has caused tremendous damage as set forth herein. Defendant's ongoing malicious and tortious conduct cannot be countenanced.

9. Gottwald has no choice but to file this additional lawsuit against Defendant. The claims set forth in this Complaint are related to the subject of the First Tennessee Action. Prior to filing this Complaint, Gottwald offered, in the interests of judicial economy and efficiency, to enter into a tolling agreement as to the additional claims asserted herein so that additional litigation would not be immediately required. Alternatively, Gottwald also asked Defendant to stipulate to an amendment of the operative complaint in the First Tennessee Action to add the claims asserted herein. Defendant, however, refused both options, thus requiring Gottwald to file an entirely new Complaint.

## **PARTIES**

10. Gottwald is a California citizen.

11. Defendant is a citizen and resident of Tennessee. Defendant is also known as Rosemary Sebert.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 because Gottwald and Defendant are citizens of different states – California and Tennessee respectively – and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has personal jurisdiction over Defendant because she is a citizen and resident of the State of Tennessee.

14. Venue is proper in this Court because Defendant is a resident of the Middle District of Tennessee.

## STATEMENT OF FACTS

### A. Gottwald Discovers Kesha and Signs Her to an Exclusive Recording Deal

15. Gottwald – who is professionally known as "Dr. Luke" – is a Grammy-nominated songwriter and producer of smash hit musical recordings by artists including Katy Perry, Britney Spears, and Kelly Clarkson, among others. Gottwald has written the most Number One songs of any songwriter ever. He was named by Billboard as one of the top ten producers of the decade in 2009 and the Producer and Songwriter of the Year for 2010, and was the 2010 ASCAP Songwriter of the Year. Gottwald is also the principal and owner of KMI, a company which furnishes the services of certain individuals in the entertainment industry.

16. In or about 2005, Gottwald discovered an unknown and unsigned musical artist named Kesha Rose Sebert when he listened to her "demo" tape. Recognizing her potential, Gottwald called Kesha at her home in Nashville, Tennessee and expressed interest in working with her. Kesha, in turn, was excited to be provided with an opportunity to work with Gottwald and record his songs. Thus, the parties' working relationship began.

17. In order to further their working relationship, Kesha entered into an exclusive recording agreement with Gottwald's company KMI, effective as of September 26, 2005 (the

4

Case 3:16-cv-02386   Document 1   Filed 09/07/16   Page 4 of 17 PageID #: 4

"KMI Agreement"). Kesha hired a sophisticated and experienced entertainment lawyer to negotiate the KMI Agreement on her behalf.

### B. Dissatisfied With the Progress of Her Career, Kesha Makes Her First Attempt to Terminate the KMI Agreement by Making Extortionate Threats to Disclose False Allegations of Improper Conduct by Gottwald

18. Shortly following the entry of the KMI Agreement, Kesha began to express frustration that her recording career was not progressing as quickly as she had expected it would. Kesha had no experience in the music business and did not understand that the process of developing an artist does not occur overnight, but rather requires time, patience and hard work.

19. Thus, in late 2005, Kesha retained representatives who repudiated the KMI Agreement on her behalf. At Kesha's behest, these representatives pressed a false and fictitious story on her behalf – that Gottwald had purportedly engaged in drug-related and other abuse of her. In their communications with Gottwald and his team, Kesha's representatives made clear that they would make this fictitious story public if Gottwald did not agree to terminate the KMI Agreement. However, Gottwald simply refused to accede to extortion and would not compromise his clear contractual rights.

### C. Kesha Abandons Her First Extortion Campaign, Reaffirms the KMI Agreement, and Signs the Prescription Publishing Agreement

20. By 2008, Kesha had become deeply frustrated by her stalled career. No record company would or could sign her to a deal because she was already signed to KMI. At that time, Kesha disavowed her repudiation of the KMI Agreement, and reaffirmed that the agreement is valid and binding. Kesha and KMI executed amendments to the KMI Agreement in 2008 and 2009, continuing their working relationship.

21. In 2009, KMI also negotiated and executed an agreement with the RCA/JIVE record label to release and promote Kesha's recordings. Sebert simultaneously executed an

Assent, Guaranty, and Entertainment Rights Agreement (the "Assent") whereby, *inter alia*, Sebert assented to the execution of the RCA/Jive recording agreement, and agreed to be bound by all grants and restrictions contained in that agreement.

22. On November 26, 2008, Kesha entered into a separate Co-Publishing and Exclusive Administration Agreement with Prescription Songs, Gottwald's publishing company (the "Prescription Publishing Agreement"). Again, this contract was negotiated on behalf of Kesha by an experienced and sophisticated entertainment lawyer.

23. Kesha was represented by a sophisticated and experienced entertainment lawyer in connection with the negotiation of the 2008 and 2009 amendments to the KMI Agreement, the Assent and the Prescription Publishing Agreement.

> **D.    Thanks to Plaintiff, Kesha Enjoys Enormous Success, and Kesha and Defendant Repeatedly Express Their Gratitude to Gottwald for Same**

24. Gottwald and KMI produced and promoted Kesha's debut album for KMI entitled *Animal* and follow-up EP for KMI entitled *Cannibal*, both of which were released in 2010. Both of these works feature extensive songwriting and production contributions from Gottwald along with the team he assembled and oversaw, have sold millions of copies worldwide, and have spawned numerous Number 1 singles, including "*Tik Tok*" and "*We R Who We R*." Gottwald put substantial energy into taking Kesha – a previously unknown singer – and transforming her into the well-known artist that she now is.

25. In addition to making Kesha a star, Gottwald also provided Defendant with valuable songwriting opportunities. Indeed, in 2009, Gottwald provided Defendant with her first major songwriting opportunity in decades (a co-write for a famous third-party artist), knowing that doing so would allow Defendant to obtain a publishing deal. Defendant expressly

acknowledged this to Gottwald, writing: "Thank you for keeping me on this song and changing my life."

26. This was far from the only favor which Gottwald graciously provided to Kesha's family. Defendant would regularly ask Gottwald to provide favors that would advance the entertainment-industry careers of herself and her other children; Gottwald often obliged. Kesha and Defendant both repeatedly expressed their gratitude and admiration for all that Gottwald had done for their careers and families.

27. For example, in a September 26, 2009 email to Gottwald, Defendant wrote: "***You are part of our family, and I hope you know, as much as you have been there for Kesha and me, that we will always be there for you, as family, and friends, if you need anything.***" And, in a June 4, 2010 email to Gottwald, Defendant stated: "***Thank you Luke[]. You have changed our lives forever. I love you !! Pebe***". Similarly, in a July 16, 2011 email to Gottwald, Defendant wrote: "I know you are going to be a great dad."

28. Moreover, Kesha sent Gottwald a birthday card, with a handwritten note stating the following:

> To the foxxy-est producer EVER!
> Ur just getting better with time!
> ***Thank you 4 helping me make my WILDEST dreams come true!***
> ***I love you!***

29. Kesha also rightly praised Gottwald in her 2012 autobiography *My Crazy Beautiful Life*, writing, among other things: "I had so many great songs that I had already done by myself, but Luke brought something new and fresh to my sound, and he encouraged me to be bold"; and "Luke is like a good coach. He is always pushing me and challenging me to get better."

### E. Kesha and Defendant Truthfully Testify in 2011 That Gottwald Never Made Any Sexual Advance at Kesha

30. On or about May 25, 2010, Kesha's former manager DAS Communications Ltd. ("DAS") commenced litigation against Kesha and Gottwald. In its Complaint, DAS alleged that Kesha purportedly breached her management agreement with plaintiff dated January 27, 2006, and that Gottwald had allegedly tortiously interfered with that contract. Gottwald filed an Answer in which he denied those allegations, and asserted counterclaims against DAS for inducing Kesha to breach the KMI Agreement by repudiating it. The action was resolved amicably, and a Stipulation of Discontinuance was entered on November 21, 2012.

31. Prior to the resolution of the action, both Kesha and her mother were deposed. At their respective depositions, Kesha and Defendant were represented by a prominent national law firm. Gottwald was not present at either deposition. During the depositions, DAS's counsel asked each of these witnesses whether the accusations of purported abuse by Gottwald against Kesha were true. Both witnesses testified that they were false.

32. Specifically, Kesha testified that she never had an intimate relationship with Gottwald, that he had never given her a "date rape drug," and that he had never made a sexual advance toward her – let alone raped her.

> Q. Dr. Luke never gave you coke or drugs?
>
> A. Dr. Luke never gave me coke.
>
> Q. Did he give you drugs?
>
> A. What kind of drugs?
>
> Q. Any kinds of drugs that are not purchasable at the pharmacy.
>
> [Kesha's attorney]: If you know.
>
> A: I don't know.
>
> \*     \*     \*

8

[Q]: Do you know what a roofie is?

A. Yes.

Q. What is that?

A. It's a drug.

Q. Which does what?

A. It's like a date rape drug.

\*       \*       \*

**Q. Did Dr. Luke ever give you a roofie?**

**A. No.**

\*       \*       \*

Q. Okay, when – **did you ever have an intimate relationship with Gottwald?**

[Gottwald's counsel]: Objection as to form.

**A. No.**

\*       \*       \*

Q. Were you ever with Gottwald at a time when you thought he was high?

[Gottwald's counsel]: Objection to form.

A. He may or may not do drugs.

Q. You don't know if he does drugs?

**A. I don't know if he does drugs.**

\*       \*       \*

Q. Did you ever sleep with Mr. Gottwald in the same bed?

A. Yes.

**Q. And you didn't have an intimate relationship while you were sleeping with him in the same bed?**

9

> **A. No.**
>
> \* \* \*
>
> Q. Did your mother complain [to DAS] about Dr. Luke having made sexual advances to you?
>
> \* \* \*
>
> A. I don't know what my mother told to [DAS]. I know that I've –
> **Dr. Luke never made sexual advances at me**, so –

33. Defendant similarly testified neither her daughter nor anyone else ever told her that Gottwald had given Kesha a date rape drug and that she did not believe that Gottwald and Sebert had a sexual relationship:

> **Q. … Before that first meeting with – with [DAS], had anyone told you that Gottwald had slipped Kesha a date rape drug?**
>
> **A. No.**
>
> **Q. Did anyone ever tell you that at any time?**
>
> **A. No.**
>
> \* \* \*
>
> **Q. Are you aware of whether he had had any kind of sexual relationship with your daughter prior to the time you met with DAS at the Chateau Marmont?**
>
> **A. I don't believe there was, no.**

F. **Kesha and Defendant Engage in a Campaign of Defamation and Extortion to Pressure Plaintiff to Accept the Termination of The Agreements**

34. Defendant – a frustrated songwriter who had a smattering of success decades ago – has grown jealous of Gottwald's talent and accomplishments, and resentful of the fact that she has no commercially meaningful songwriting opportunities outside of those which Gottwald graciously provided her. Defendant has also grown resentful of the fact that only one of the numerous songs which she has co-written with Kesha (the "Defendant Co-Authored

Compositions") was selected to be a single. Defendant also has malice toward Gottwald based upon her (incorrect) belief that in negotiations with Gottwald and his companies over the allocation of publishing revenue for Defendant Co-Authored Compositions, Defendant has ended up with a smaller share of the revenue that that to which she believes she is entitled. Defendant further believes that if Kesha were able to obtain a new recording agreement with a third party then: (a) Defendant would have more control over the songwriting process; and (b) more songs Defendant co-writes would be selected as singles, and Defendant would receive the financial remuneration and public acclaim attendant with same.

35. Kesha and Defendant orchestrated a campaign of publishing false and shocking accusations against Gottwald to extort Gottwald and his companies into: (a) letting Kesha out of the KMI Agreement and the Prescription Publishing Agreement; and (b) according Defendant a greater income share in the Defendant Co-Authored Compositions than that to which she is currently contractually entitled. This campaign began with the baseless accusations which are the subject of the related First Tennessee Action and the New York Action currently pending against Defendant and her daughter Kesha, respectively, namely that Gottwald drugged and raped Kesha. He did not.

36. Even after the filing of the First Tennessee Action, Defendant's campaign has continued. She has made her smear campaign public and has continued broadly disseminating these same shocking allegations to the greater public. These accusations are false, were published with malice, and constitute defamation *per se*. Specifically, Defendant has made the following defamatory statements:

37. <u>The Defamatory Tweets.</u> Defendant has consistently used her Twitter page to publicize her baseless allegations that Gottwald purportedly abused her daughter. As of

11
Case 3:16-cv-02386 Document 1 Filed 09/07/16 Page 11 of 17 PageID #: 11

September 7, 2016, Defendant has approximately 15,315 followers on Twitter. She has repeatedly taken to Twitter to repeat her allegations of abuse to her thousands of followers and encourage Kesha's fans to rally against Gottwald. For example, on September 22, 2015, Defendant posted a "tweet" (i.e., a post) on her Twitter page which featured a link to an online Billboard article which discussed a recent filing in the New York Action, which repeated the false allegations of sexual abuse made by Kesha therein. She posted the link along with the following caption: "Every allegation against Dr. Luke is true, my animals[.]"

38. On November 5, 2015, Defendant again used her Twitter page to repeat her baseless allegations against Gottwald. That day, she posted a series of tweets that stated: "Kesha can't legally put out music unless she makes it under complete control of a man who raped her at 18."; "Sony supports the rapist."; and "The rapist is doing exactly what he warned he would do." On November 15, 2015, Defendant posted another tweet with the same baseless allegation: "We can tell Sony what we think of them supporting a rapist by not buying Sony products!!" Though Gottwald is not expressly named in these posts, it is nonetheless clear from the content of the first tweet and Defendant's references to Sony (a Counterclaim-Defendant in the New York Action) that the "rapist" Defendant is referring to in these posts is Gottwald. Indeed, the November 15, 2015 tweet contains a link to a petition which urges Sony Music to release Kesha from her contracts with Gottwald and his related companies. When viewed in context, it is clear that these three posts refer to Gottwald.

39. Throughout February 2016, Defendant took to Twitter numerous times to continue her public smear campaign against Gottwald. On February 1, 2016, within a series of posts regarding Gottwald, some of which expressly identified Gottwald by name, Defendant

12
Case 3:16-cv-02386   Document 1   Filed 09/07/16   Page 12 of 17 PageID #: 12

stated: "Animals, We all know about bully's! Let's stand together against the rapist and the corporate giant Sony for Kesha[.]"

40. Defendant did not stop there. She continued her defamatory posting spree through the rest of the month. On February 9, 2016, Defendant reposted a tweet from a Kesha supporter which stated, "I am refusing to buy any @Sony product until Kesha is free from her abuser, @TheDoctorLuke. Who's with me?"

41. A few days later, on February 14, 2016, Defendant posted a tweet which praised her daughter Kesha for being brave enough to come forward with her allegations against Gottwald. Immediately following this post, Defendant repeated her baseless claim that Gottwald abused her daughter: "And no one comes forward because they are warned by their RAPISTS, 'Say anything, and you will never work again!'" Then, on February 19, 2016, Defendant reposted a series of tweets posted by Kesha fans which contained the hashtag "#SonySupportsRape". One of these posts contained a link to an article regarding Kesha's allegations of abuse that had been asserted in the New York Action, which makes clear that this hashtag also refers to Gottwald. These accusations against Gottwald are false – as Defendant knows and has testified to under oath.

42. <u>The Defamatory Interview.</u> Defendant did not stop there. On March 10, 2016, Billboard magazine published an exclusive interview with Defendant. Defendant used this exclusive interview as another opportunity to continue her public smear campaign and once again defame Gottwald with the same lies.

43. That same day, Defendant posted a link to the Billboard interview on her Twitter page in order to further publicize the baseless allegations contained therein. In a subsequent

13

post, Defendant expressed her satisfaction with the article and commented that the author "did a beautiful job on the Billboard piece !"

44.     The Billboard article is replete with Defendant's same baseless accusations that Gottwald purportedly abused her daughter over ten years ago.  Specifically, Defendant stated: "I wanted Kesha to come forward a long time ago and end this relationship with Dr. Luke immediately after the [alleged] rape" … "But if she wanted to have a shot at the music business, she had no choice but [to work with him]."  Defendant also noted during the interview that "[Kesha's former manager] was the only other person she was sure knew about the rape at that time."  Upon information and belief, the bracketed words, including "[alleged]," were inserted by the writer or an editor and were not stated by Defendant.

45.     In the article, Defendant also recounted in detail her version of the purported events on the day following Gottwald's alleged sexual abuse of her daughter:  "By midafternoon the day after the party, Pebe had grown concerned after calling Kesha multiple times and getting no response … Finally, her mother maintains, Kesha returned her call, saying she had woken up naked in what she believed was Dr. Luke's hotel room. 'Mom, I don't know where I am. I think we had sex. I'm sore and sick. I don't know where my clothes are. I think I need to go to the hospital,' she said. Then Kesha's phone battery died. Pebe kept calling her daughter until Kesha called back from the hotel's landline."

46.     Defendant continued, "Looking back, I don't know why we didn't go to the police. Kesha told me not to do anything. She said, 'Mom, I just want to sing. I don't want to be a rape-case victim. I just want to get my music out.' I didn't follow my instincts."

47.     Despite the patent falsity of these accusations, Defendant has made clear that extortion is the ultimate goal of this defamatory campaign.  In earlier communications with

Gottwald and his representatives, Defendant had threatened to further disseminate accusations of the type above unless Gottwald let Kesha out of her agreements with his companies, and provide Defendant with a larger financial interest in the Defendant Co-Authored Compositions.

## COUNT I

### (Defamation)

48. Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully stated herein.

49. The statements that Defendant made concerning Plaintiff, as set forth above, are false.

50. The false statements that Defendant made concerning Plaintiff were published to third parties, including the public at large.

51. In making these false statements Defendant acted with knowledge of their falsity, and with wanton dishonesty such that punitive damages are warranted. Defendant also acted with malice. No privilege applies to the publication of these statements.

52. The statements were made with an intent to injure and have injured Gottwald's public reputation for character and standing in the community, as well as in his business as a music producer/songwriter who works closely with a broad range of artists and writers.

53. Defendant's conduct rises to the level of defamation *per se*, and no proof of special harm or damages is necessary. To the extent proof of special harm or damages is necessary, as a proximate cause of Defendant's defamatory statements, Gottwald has suffered special damages to his reputation, and to existing and potential business relationships with other artists and record labels in an amount exceeding $75,000 and to be proven at trial, plus interest.

15
Case 3:16-cv-02386   Document 1   Filed 09/07/16   Page 15 of 17 PageID #: 15

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court grant it relief as follows:

1. On each cause of action for damages in an amount to be determined at trial, but greatly in excess of the $75,000 jurisdictional minimum.

2. On each cause of action for an award of punitive and exemplary damages in an amount to be determined at trial

3. For pre-judgment interest according to law.

4. For attorneys' fees if and to the extent allowed by law.

5. For costs of suit incurred herein.

6. For such other and further relief as this Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all claims so triable.

DATED: September 7, 2016					By: /s/ Timothy L. Warnock

MITCHELL SILBERBERG & KNUPP LLP
Christine Lepera (*pro hac vice motion to be filed*)
Jeffrey M. Movit (*pro hac vice motion to be filed*)
12 East 49th Street, 30th Floor
New York, New York 10017-1028
Telephone: (212) 509-3900
Facsimile: (212) 509-7239
ctl@msk.com
jmm@msk.com

RILEY WARNOCK & JACOBSON, PLC
Timothy L. Warnock (BPR # 12844)
Elizabeth O. Gonser (BPR # 26329)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
twarnock@rwjplc.com
egonser@rwjplc.com

*Attorneys for Plaintiff*